MEMORANDUM OF DECISION
This case presents petitions for the termination of the parental rights of Keysha L.L., the mother of the four children and the four individuals who were the male biological progenitors. Three are known and have been served with process. The father of one of the children is unknown. Only one of the fathers, Keith E., was represented and had occasional visitation. When the children were first placed, Keith demonstrated some interest in the case when he was not incarcerated. Later however, Keith married another women and stopped visiting his child. He has not provided support for the child and has had no reported contact with his child in over a year. The fathers of the other children have demonstrated no interest whatsoever in these children. The minor children, two girls and two boys, were born on October 13, 1990, February 4, 1992, December 28, 1992 and September 29, 1994: the oldest is nearly 7, the youngest 3.
The court finds that the mother has appeared and has a court appointed attorney who vigorously and effectively contested the termination of Keysha's parental rights. The fathers have been served. Keith has had counsel appointed. The attorney appeared for the contested hearing. The attorney represented that his client has failed to cooperate or contact him for more than six months and was permitted to withdraw from the case.
The court has jurisdiction in this matter; there is no CT Page 10218 pending action affecting custody of the children in any other court and reasonable efforts have been made to reunify this family.
FACTUAL FINDINGS;
The court, having read the verified petitions, the social studies, the various documents entered into evidence and heard the testimony of various case workers, evaluators, Dr. Theresa Kreibick for the mother, a social services aide, a foster mother and other witnesses makes the following findings by clear and convincing evidence. It may be noted that while the trial of this case occurred over four days, the facts were largely undisputed.
Keysha, the mother of these children, was born in New York in 1971. Her mother was 15 years old at the time of Keysha's birth. Like Keysha, her mother had four children by different paternities. Each of those men were addicts/alcoholics. Keysha's mother was recently in out-patient treatment for substance abuse. Keysha's paternal and maternal grandparents were also substance abusers. True to form, Keysha became a poly-substance abuser of alcohol and crack cocaine. By 1995 Keysha supported her $300 per day habit by prostitution. She was 24 years of age.
On March 6, 1992 the Department of Children and Families ("DCF"), then known as the Department of Children and Youth Services, had petitioned the court alleging that Keysha's children were neglected. Keysha had two children at the time. The petition alleged that the children were found on the street with their intoxicated mother at 4:00 AM. The temperature was 31 degrees Fahrenheit and the children were nearly hypothermic. Her second child had been born the previous month with a positive toxicology for cocaine.
On June 10, 1992 the children were adjudicated neglected. The younger of the two girls was committed to the Commissioner of DCF. Consistent with the policy of family preservation then followed by DCF, the older daughter was allowed to return to the mother at an in-patient drug rehabilitation program known as Crossroads, under an order of Protective Supervision. Keysha relapsed after her six month drug treatment program and the older daughter was again brought before the court and subsequently adjudicated neglected on February 4, 1993. She was also ordered committed to the Commissioner of DCF. These girls have been out of their mother's care since 1992. CT Page 10219
Keysha had her third child, her first son, on December 28, 1992. This child went into DCF care within 6 weeks of his birth when Keysha returned to her shelter intoxicated and unable to care for the child. This child was returned to Keysha under Protective Supervision in August 1993. On March 17, 1994 this child was again removed from Keysha. Keysha was still using drugs, her apartment was unsanitary, she continued to be the subject of domestic violence at the hands of Keith E., and she was not properly caring for her child. The child was adjudicated neglected on May 13, 1994. This child, now close to 5, has been out of his mothers care since he was 15 months old. He and his two older sisters are in a foster care placement together where they have become psychologically bonded to their foster mother.
The youngest boy was born on Sept 29, 1994. At age five months, Keysha left the child with an unrelated 16 year old person whom she had met the day before, and was gone for two days when the caretaker, who needed to go to school, called the police. Keysha was still using drugs. DCF obtained an order of temporary custody in February, 1995. This child was committed as a neglected child on August 16, 1995. The boy was placed with the child's godmother where the child remains today. This foster parent was a substance abuse counselor who Keysha had met at one of her programs. The child is closely bonded with his foster mother and views this caretaker as his actual parent. He has lived all of his three years with his foster parent, save his first five months of life.
Keysha was known to be with Keith in 1991, although she may have been with him even earlier. When she was involved with Keith she was a victim of domestic violence and was involved with drugs and prostitution. In 1991, Keysha claims to have successfully completed a substance abuse program at Spooner House of the Griffin Hospital. This was followed by relapse and life with Keith. In 1992 Keysha claims to have completed a six month in-patient substance abuse program at Crossroads with her oldest daughter in residence. She was in this program from May until October 30, 1992. This was followed, within two weeks of her discharge, by relapse and life with Keith. Keysha claims to have completed a 90 day in-patient program at Dutcher Hall, Connecticut Valley Hospital. She had been offered a more structured comprehensive program which was an 18 month program at DAY TOP but Keysha refused to enroll in that program. She finished the Dutcher Hall program in July, 1993. This was CT Page 10220 followed by relapse and life with Keith. Keysha left Keith and her new apartment in October, 1993 and went into a battered women's shelter again.
On July 6, 1994, Keysha entered a detoxification program while she was nearly 8 months pregnant with her youngest child. Shortly thereafter she entered Amethyst House, a Crossroads program. The youngest child was born there on September 29, 1994. Keysha and the infant stayed in this program until her discharge on January 16, 1995. It was in this program that a substance abuse counselor became this infant's godmother, and ultimately, the child's foster mother.
DCF was actively working toward reunifying Keysha with her other three children. DCF had obtained a security deposit for Keysha to obtain an apartment. She was set up to attend a program known as MACHO and to work with a social service provider known as the Women's Corner. On January 20, 1995 she was expected to have a visit with her children. She failed to appear for the visit. On January 23, 1995 the Women's Corner reported she wasn't attending classes. On March 16, 1995 her landlord called to report that Keysha couldn't be awakened and that she had a five month old baby with her. In May of 1995, DCF obtained a 96 hour hold on the child when Keysha left the child for two days with the 16 year old unrelated girl she had just met a day earlier. Since May of 1995, none of the children have been in Keysha's care. It was not adequately explained why DCF did not begin permanency planning for these children at that time.
Many states in the United States have begun parallel permanency planning for children along side reunification efforts. Connecticut has not adopted this more enlightened, child oriented approach. Given Keysha's history dating back to 1992, the failure of DCF to initiate a co-terminus petition on behalf of the youngest child and termination petitions on behalf of the older children in May of 1995 is not understandable.
On August 10, 1995 DCF arranged for Keysha to enter the Morris/Kendall House, a residential treatment program and shelter for poly-substance abusers. A substance abuse counselor testified that they were aware that Keysha had been in two residential programs with her children, she had completed numerous other programs and was unable to maintain her sobriety outside of a program. They described her as high risk for relapse. Keysha quietly left through the back door of the program on September CT Page 10221 10, 1995 against clinical advice. She was observed getting into a car with a man. She never returned to that program.
Her oldest child had been born five years earlier. Keysha had not been well-parented herself as a child and was unable to parent her own children.[2] Despite massive attempts to rehabilitate her as a person and as a parent, the efforts had failed. All service agreements with Keysha and all court approved expectations had been consistently violated for nearly five years. But decisive closure to a case is not a hallmark of DCF.
The court heard testimony from Keysha's own independent psychologist; a court-appointed psychiatrist who evaluated Keysha and the children; therapists from the Yale Child Study Center who are the children's therapists, including a clinical psychologist; and two pre-doctoral interns. The court places great credit upon their testimony. This court finds that Keysha has not been physically or emotionally available to her children during extremely crucial developmental periods of each child's life. While Keysha has maintained visitation with her children through the years, her involvement was, at times, so uneven that it was harmful to the children causing significant behavioral regression. One therapist testified that children interpret the starts and stops and lack of consistency as indications of their own unworthiness. This is devastating to the children's self-esteem and sense of competence. As a consequence the therapists indicated that the children had very dramatic behavioral displays after visitation with Keysha. Each visit undermined the children's sense of security and safety and threatened their well-developed attachment to their supporting and nurturing foster mothers. The children's single greatest fear presented by visitation with Keysha was that they would be separated from the person that they identified as their parent, that is, their foster family. While some of the therapists carefully couched their fears for the children in psychological jargon, ". . . a separation from the foster mother would re-expose her to emotional trauma which would undermine the developmental gains she has made . .", other comments made by the therapists were much more direct and understandable, ". . separation from the foster mother would be catastrophic to the child." and another, ". . separation would be devastating to the child."
The court finds by clear and convincing evidence that these children have suffered significant neglect at the hands of their mother during her years of substance abuse, the children are CT Page 10222 extremely fearful of removal from their present homes, they have formed a primary attachment with persons other than Keysha, they have established themselves in the home of the foster parents, and, accordingly, that permanent placement and continuity of care,[3] in their present foster home is in each child's best interest.
The court further finds that the foster parents have made remarkable efforts at parenting these children over the past four and a half years. The foster mother of the three older children has provided a safe and nurturing environment and has raised these children as her own. She has seen to their medical, educational, and emotional needs. She has been there daily to protect and care for them. She is seen as an "exceptionally competent parent". "She is able to put their interests [the children's] ahead of her own and at the same time, she is supportive of contact between the children and their biological parents." (Petitioner's Exhibit 13) Keysha has not been able to put the children's needs ahead of her own. She does not understand the threat that she now poses to the children's security.
With respect to the youngest child, the only parent he has ever known or has any recollection of is his present foster mother. Even when this child was in Keysha's care as an infant in the Amethyst House in-patient drug program, the foster mother, who was a drug counselor at this program working the evening shift, took care of this infant at night while Keysha slept. Keysha appointed her as the child's God-mother. This foster mother has raised this child as her own and is viewed by the child as his mother. The foster mother testified at the trial that if Keysha's parental rights are terminated, she would adopt the child. The Department of Children and Families brought these petitions to terminate the parental rights on April 18, 1996. DCF initially alleged abandonment, General Statutes § 17a-112
(c)(3)(A); failure to rehabilitate General Statutes § 17a-112
(c)(3)(B); and no ongoing parent child relationship General Statutes § 17a-112 (c)(3)(D). At the commencement of the trial, counsel for the petitioner withdrew the grounds of abandonment and no-ongoing parent child relationship.
It is curious to note that the petitioner did not allege that the children had been denied, by reason of acts of commission or omission by the mother, the care, guidance or control necessary for the children's physical, educational, moral or emotional CT Page 10223 well-being. General Statutes § 17a-112 (c)(3)(C). The evidence clearly established that each act of ingesting cocaine, which Keysha frequently admitted to the social workers, rendered her unable to provide the children the care, guidance and control that the children needed.
General Statutes § 17a-112 (c)(3)(B) provides grounds for termination of the parental rights where the children have previously been adjudicated neglected and the mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the children, such parent could assume a responsible position in the lives of the children. General Statutes 17a-112 (c)(3)(B) The principle issue raised by this case is whether, on April 18, 1996, the mother, Keysha, had failed to rehabilitate herself within the meaning and contemplation of the statute. Further facts are necessary.
Keysha fled the Morris/Kendall House on September 10, 1995. DCF made a decision to seek a termination of Keysha's parental rights at that time but failed to act for nearly half a year. In the interim, on or about November 1, 1995, Keysha entered a substance abuse program known as Liberation House. Unlike the other programs, Keysha was tired of doing drugs and ready to fully participate in her personal rehabilitation. She testified that she was honest, applied herself, took suggestions, became committed to her sobriety and successfully completed the program on March 14, 1996. DCF was unimpressed. Keysha had successfully completed many other programs but, in each and every case, she had relapsed. DCF commenced the petition to terminate her parental rights.
Keysha then entered an out-patient after care program. She had job training, relapse prevention counseling and drug screening. She completed her after-care on August 16, 1996, and entered New Life House, an unstructured living arrangement for drug and alcohol free residents. In this house the residents must attend meetings at Narcotics Anonymous or Alcoholics Anonymous. In the first 90 days of residence, the resident must attend 90 meetings; thereafter 4 meetings per week. Keysha has remained living in that facility to this date. On Sept 21, 1996 while at the New Life House, Keysha married Marvin T., whom she met at Liberation House. Both are in recovery from substance abuse. They live together at New Life House. The house does not permit children to reside in the facility. CT Page 10224
Keysha has found employment as a security guard. Her supervisor testified that she has worked for him as a valued employee for over a year. She has risen to the grade of sergeant and is in line for commendations for her hard work and devotion. She loves her work. She is now learning to use word processing programs on a computer. For the first time in her life, she has filed a tax return. She is justifiably proud of the fact that she is now a taxpayer!
The court finds that Keysha's recovery is truly remarkable. She is a productive citizen. She deserves great credit for her exceptional efforts. She now has a life and a future that she did not have as an active addict. Regrettably however, her recovery comes too late for these children. There comes a point in time, now long past, when the paths of the children and the mother have been separate too long. The court finds that too much has transpired in the development of the children's lives and their attachments are too well established for the children to now be reunited with Keysha. Even with all the progress that Keysha has made she is not now able to care for the children. Her sobriety is fragile. The risk of reunification and Keysha's subsequent relapse are too great. Her whole support system would be enormously taxed if the children were returned to her, assuming that this was in the children's best interest, which the court has previously concluded it is not.
The clinical psychologist who testified with respect to Keysha's present psychological status admitted that whichever way the court decided this case, the children were going to suffer another loss; either with their mother or with their foster parents. In one situation the court sees proven stability and nurturing care vital to the childrens well-being. In the other situation, a recovering natural parent with a history of poor parenting, presently living with a husband, unknown to the children, with problems of his own, both presently living in a structured environment and at risk of possible future relapse. While the court is proud of Keysha's recent achievements, the children's need for continuity of care in their present homes is paramount.
In this case, the older children had a parental relationship with the mother. The fathers had not established the existence of an actual relationship with their children that "society recognizes as worthy of respect and protection . . ."[4] The CT Page 10225 mother, through her neglectful conduct and addiction, compelled the placement of the children in foster care. During the period of foster care, the children have lost whatever parental attachments they had to their biological parents and, more importantly, formed a reciprocal, quality relationship of the highest magnitude with the foster family. This relationship is commonly known as that of psychological parent, a person or persons who allow for a child's attachment based upon day-to-day interaction and companionship and is connected to the child's needs for physical care, nourishment, comfort, affection and stimulation.[5] At this point, when, following the parent's legally proscribed neglectful conduct, the children no longer have a parent-child relationship with the parent and have formed a binding relationship with a long-term care-giver, as in this case, it is legally too late for reunification. The preeminence of the parental rights over the best interest of the child has shifted; "the rights of the `absent' parents should be terminated in favor of the `new' familial ties. These bonds deserve the same protection that ongoing relationships between children and their natural or adoptive parents deserve and traditionally receive."[6]
 ADJUDICATION
The court finds by clear and convincing evidence that the mother, Keysha, notwithstanding her remarkable recovery from addiction, has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the children, she could assume a responsible position in the lives of these children. General Statutes § 17a-112 (c)(3)(B) The court finds that this ground has existed for more than one year.
With respect to the children's fathers, the court finds that they have demonstrated no interest or concern for the children, they have failed to support or visit the children and have abandoned the children. General Statutes § 17a-112 (c)(3)(A). Additionally, they have failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the children that they could assume a responsible position in the lives of these children. General Statutes § 17a-112 (c)(3)(B). These grounds have existed for more than one year.
MANDATORY FINDINGS General Statutes § 17a-112 (e): CT Page 10226
1) The timeliness, nature and extend of services offered. The court finds that parental, psychological and substance abuse services were offered, in-home services were provided, visitation was offered and specialized foster care was provided by DCF.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the Adoption Assistance and Child Welfare Act of 1980. The court finds that DCF made robust efforts to assist Keysha in parenting in the home and, after removal, to obtain needed treatment to resolve her addiction issues. They allowed her to keep two of her children with her during residential substance abuse treatment. DCF persisted beyond a reasonable time-frame to rehabilitate and reunify this mother and her children. The fathers were unavailable or unwilling to benefit by services.
3) The terms of applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations, etc.: The court finds that the mother did not fulfill or comply with the expectations or service agreements for more than five years. Only after DCF made the decision to terminate her rights did the mother fully meet the expectations of the court. This came too late to benefit the children. It was, of course, a great benefit to Keysha. It no doubt saved her life.
4) The feelings and emotional ties of the children with respect to the parents and foster parents, etc.: The court finds that the children are bonded to their present foster families, they consider themselves a part of the family and that no presently existing emotional parent-child bonds will be broken by termination of the parents rights. While the children do know their mother, visit with their mother and may even enjoy the visits, the court finds that this relationship is often the cause of fear and insecurity for the children in that they perceive the visits as a threat to the bond with the psychological parents.
5) As to the age of the child: The children are seven, five, four and three years of age. Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected children. In re Juvenile Appeal (84-CD),189 Conn. 276 (1983). The Appellate Court has also correctly noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." Inre Alexander V., 25 Conn. App. 741, 748, 596 A.2d 930 (1992); see CT Page 10227 generally, BEYOND THE BEST INTERESTS OF THE CHILD (1979), supra.
6) The efforts the parent have made to adjust their circumstances or conditions: The court finds that the mother has a five year history of unsuccessful recovery. She has completely violated virtually all of the service agreements and expectations in 1992, 1993, 1994 and 1995. The fathers have made no known efforts to rehabilitate themselves as parents. (A) Keysha has maintained visitation with the children consistently during the past year. The visits have been pleasing to Keysha and the children have behaved appropriately but, the visits have produced behavioral problems for the children subsequent to the visits due to the children's fear of further loss, abandonment and rejection. (B) Keysha has had continuing contact with the foster parents. It is possible that the foster parents, who are pre-adoptive, may be willing to allow future contact between Keysha and the children. This is a matter that will be left for resolution to the good judgement of the foster parents and the children's therapists. The court is a crude instrument to deal with such delicate issues.
7) The court finds that there has been nothing to prevent the parents from maintaining a meaningful relationship with the children. There was no unreasonable DCF conduct noted.
DISPOSITION
Based upon the foregoing findings, the court determines that it is in the children's best interest for a termination of parental rights to enter with respect to the mother, Keysha L. and the male biological parents and, accordingly, a termination of their parental rights is ordered. It is further ordered that the Commissioner of the Department of Children and Families is appointed statutory parent for these children for the purpose of securing adoptive families. If the foster parents are willing to adopt, it is the court's direction that they receive first consideration. The commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and further reports as are required by State and federal law.
Francis J. Foley, Presiding Judge Child Protection Session