MEMORANDUM OF DECISION
This case seeks a termination of the parental rights of Nilsa A. to her three daughters, Tricia, Martika and Stephanie, now ages twelve, eight and six. It also seeks the termination of the rights of the biological father of the two youngest girls, Roberto A. The father of Tricia is deceased. All three children were placed in foster care on August 8, 1993 by the Department of Children and Families (hereafter "DCF") after Stephanie was found to have been physically abused by her mother's boyfriend while Nilsa was in the hospital. The children were subsequently adjudicated neglected and uncared-for. Their commitment to the care and custody of DCF was ordered on August 8, 1994. Petitions for termination of parental rights were filed on June 16, 1997.
The court finds that the mother was personally served with the petitions for termination and has appeared through court-appointed counsel. Service on Roberto A. was made by certified mail, publication in The New York Post and subsequently in The Tampa Tribune, a newspaper with general circulation in the Tampa, Florida area, where he was living. The court finds that proper notice has been given in accordance with the law. The court further finds, from the evidence provided by a DCF social worker, that Roberto A. had actual notice of these proceedings through a telephone call made to his residence in Florida. No counsel was appointed for Roberto A. as he has never expressed any interest in his daughters and to do so would serve no purpose. The court has jurisdiction in this matter and further finds that there is no pending action affecting custody of Tricia, Martika and Stephanie in any other court.
At trial, DCF proceeded against Nilsa A. on the grounds that these children have previously been adjudicated neglected and that she has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the children, she could assume a responsible position in their lives. Other alleged grounds were not pursued. Connecticut General Statutes § 17a-112 (c)(3)(B). The same grounds as well as abandonment and the failure to have an on-going relationship with the children was alleged against Roberto A. Connecticut General Statutes § 17a-112 (c)(3)(A), (B), and (D).
1. FACTS
The court has heard two days of testimony from the DCF social workers, the court-appointed psychologist evaluator, Dr. Ginther, CT Page 2292 the children's therapists, the therapists working with Nilsa A. and the director as well as a worker at Hogar Crea, the drug rehabilitation program in which she has participated for the last eleven months. Nilsa A. herself testified about her struggle with her drug addiction. In addition eleven exhibits were introduced into evidence. The court also took judicial notice of the prior proceedings involving the parties to this case and their children. Nilsa A. attended the trial and, through her counsel, vigorously contested the petition. The court makes the following findings and the reasonable inferences supported by those findings from the evidence presented at trial.
A. Grounds for Termination
1. As to the Mother, Nilsa A.
While the initial involvement of DCF was precipitated by the physical abuse of Stephanie by Nilsa A.'s boyfriend in 1993, the pivotal concern for DCF has been Nilsa's long-standing heroin addiction which began when Nilsa was nineteen years old and predates the birth of these three children. Nilsa also has three older children who are now in the care of her mother and with whom DCF has also been involved. Her addiction has caused her many difficulties, not the least of which has been involvement with the criminal justice system and her ongoing inability and unavailability to care for her children. After the removal of the children in 1993, many services were offered to Nilsa to help her deal with and overcome her addiction. Since 1993, there have been referrals to Blue Hills Hospital, Health Care, Inc., an outpatient program at the Rushford Center, as well as for individual counseling and parenting education. Nilsa was discharged from all these programs, both in-patient and out-patient, for her failure to attend, failure to comply with the rules of the establishment and positive urine screens. As one of the DCF caseworkers, Jose Soler, testified concerning the many services offered: "You name it, we tried it." Finally in March, 1997, Nilsa enrolled in a long term, in-patient drug abuse treatment program, Hogar Crea, where she has begun the process of dealing with her addiction. When questioned at trial, she testified that the day before her admission in Hogar Crea was the last day of her drug use.
Based on the reports from the workers and supervisors who testified in court, she is progressing well and has had eleven months of sobriety. These eleven months are the longest drug free period she has had since she was nineteen. All the experts, the CT Page 2293 therapists and Nilsa herself agree that as of the filing of the termination petitions on June 16, 1997, Nilsa had not rehabilitated herself to the point where it could be expected that within a reasonable period of time, she could care for her children. The court finds from the clear and convincing evidence that she had not then been able to do so. The crucial issue is thus not whether or not the grounds for termination have been proven, but whether it is in the best interests of the children that their rights to their mother be severed.
Nilsa testified at trial to her progress in taming the demons of addiction. She knows that her sobriety, is maintained one day at time and that there are no guarantees about the future. She has made remarkable and commendable progress. Her poignant testimony speaks to her determination, her reawakening sober self and the new values she holds. She knows that she failed her children and she wants to try again. But she knows, too, that it will be some time before she is ready to have them in her care and that she will need significant help to do so.
2. As to the father of Martika and Stephanie, Roberto A.
The evidence about the father of Martika and Stephanie disclosed that Roberto A. has never contacted DCF about his children. He has not inquired about their welfare, written them, paid support or provided funds for their care. He has not seen the two youngest girls in many years. He was never married to Nilsa and resides in Florida. Mr. Soler, a DCF caseworker, testified that he had telephone contact with Roberto's wife in Florida, after locating the home. She stated in June or July of 1996 that Roberto A. would contact DCF, but no such contact was ever made. He has no relationship with Martika or Stephanie. As for the father of Tricia, the court finds from the record of the prior proceedings concerning these children, that he died on December 27, 1996 while incarcerated.
2. ADJUDICATION
Based on clear and convincing evidence, the court concludes that Nilsa A. has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of her children, she could assume a responsible position in their lives. Connecticut General Statutes § 17a-112(c)(3)(B). As of the date of the filing of the termination petition on July 16, 1997, CT Page 2294 Nilsa was not ready to resume their care and her sobriety was only of three months standing. Further, the children had been adjudicated neglected on August 8, 1994 and have been in foster care since August of 1993; more than four years. The court also finds that this ground had existed for significantly longer than one year at the time of the filing of the petitions.
The court also finds by clear and convincing evidence all three grounds alleged against Roberto A. have been proven by DCF. The first of those grounds, abandonment, focuses on the parent's conduct. In Re Michael M., 29 Conn. App. 112, 614 A.2d 832
(1992); In Re Rayna M., 13 Conn. App. 23, 36, 534 A.2d 897
(1987); In Re Kezia M., 33 Conn. App. 12, 632 A.2d 1122 (1993). "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In Re Juvenile Appeal (Docket No. 9489),183 Conn. 11, 14, 438 A.2d 801 (1981). Roberto A. has not pursued visitation with the children, has not displayed love, affection or concern for them and has abandoned them completely.
Robert A. also had no ongoing relationship with his two daughters. "The question is whether they [the facts] substantiate a finding by clear and convincing evidence that no relationship ever existed between the parent and child, or that the relationship has terminated, without any future hope for its establishment or reestablishment." In Re Midaglia M.,6 Conn. App. 194, 211, 504 A.2d 532 (1986); In Re Juvenile Appeal (84-3),1 Conn. App. 463, 473 A.2d 795, cert. denied, 193 Conn. 802,474 A.2d 1259 (1984); In Re Juvenile Appeal (Anonymous),177 Conn. 648, 670-671, 420 A.2d 875 (1979). That question is clearly answered by the clear and convincing evidence before the court. The biological father's relationship to Martika and Stephanie never existed and he has done nothing to establish it. There is no reason to believe that there is any future hope for such action on his part. That there had been no rehabilitation on the basis of these findings is also a foregone conclusion and the court so finds by the clear and convincing evidence. The court finds as to Robert A. that all three grounds have existed for substantially more than one year prior to the filing of the termination petitions on July 16, 1997.
3. THE BEST INTERESTS OF THE CHILDREN
CT Page 2295
Tricia and Martika were placed in foster care together. They have remained in the same foster home together for the past two years and are doing well there. They are performing well in school, are motivated students and fond of the other children in the home. The caseworkers report that both wished to be adopted by the family with whom they reside. The children's therapist from February of 1996 to March of 1997, Deborah Hanratty, testified to the same expressed preferences. She stated that Tricia exhibited some anger at her mother and was aware of her use of drugs. She found her to have a positive relationship with her foster mother. In her opinion, she found both Tricia and Martika confused about their divided loyalties to their mother and their foster mother. She described how Martika drew a home during play therapy and the foster mother lived on the first floor and her biological mother on the second floor. She made a play dinner and invited both her biological mother and foster mother and also drew a divided heart to describe her feelings at that time. Ms. Hanratty testified that both girls exhibited their need for permanency and that neither child, indeed no child, should have to live with the "uncertainty as to who they would live with and bond to."
Stephanie, however, has had a more difficult time than her two older sisters. When originally placed, she was very defiant and hard to control. She has had multiple foster home placements, because of her behaviors. She was placed in a specialized foster home in August of 1996 and has blossomed in the care of her foster mother in this setting. James C. Black, M.D., who provided a psychiatric consultation about a month after her placement, on September 30, 1996, found her to be "making substantial maturational progress. Apparently in her previous foster home, she was quite aggressive and may even have fit the diagnostic label of Oppositional Defiant disorder. However, . . . Stephanie is doing quite well, in controlling herself, and obviously finds her new environment security providing."
Mary Reyes, a therapist working with Stephanie, found a dramatic change in her behavior after her placement in the specialized foster home. She worked with Stephanie for over a year from the time of her initial placement in the home until September of 1997. She stated that Stephanie "requires a lot of attention" and that she is a child with specialized needs. She, like the therapist for Tricia and Martika, found this child in need of permanency now and that she should not have to wait longer for such security in her life. CT Page 2296
Dr. Laura Ginther evaluated the three girls with their mother in September of 1997. At that time, certain referral questions were propounded for her response. Based on her interviews and testing, she concluded that Tricia "seems to have idealized her father, and may believe that her life would be completely different if he were still in her life." Her relationship with her mother was not strong. Dr. Ginther stated that "Her responses to test materials were remarkable for their lack of attention to her relationship with her mother." She testified that Tricia did not feel safe with her mother. Tricia again articulated her preference to live with her foster family or perhaps her maternal aunt. Martika, too, "presented as a child who is significantly attached to her foster family and the extended relatives associated with this family." She testified that Martika stated that she would be sad if placed with her biological mother. Dr. Ginther also found Stephanie significantly attached to her foster mother, who was the primary figure in her life. Dr. Ginther concluded that the psychological parents of these three children were their foster parents.
The meaning and importance of a psychological parent has been defined in JOSEPH GOLDSTEIN, ET AL., BEYOND THE BEST INTERESTS OFTHE CHILD 98 (1979). "A psychological parent is one who, on a continuing, day to day basis, through interaction, companionship, interplay and mutuality, fulfills the child's psychological needs for a parent, as well as the child's physical needs." Having a psychological parent is of utmost importance for the maturation of a child and his or her ability to become a productive, healthy and happy adult. In another context, the Supreme Court has noted in Capetta v. Capetta, 196 Conn. 10, 16, 490 A.2d 996 (1985):
 "In the search for an appropriate custodial placement, the primary focus of the court is on the best interests of the child, the child's interest in sustained growth, development and well-being, and in the continuity and stability of its environment."
Nilsa has not been able to provide nurturing, continuity and stability for her children. That she, has not been able to remain her children's psychological parent is an unfortunate corollary of her significant drug abuse, which in recent years had increased to the consumption of four bags of heroin a day.
Dr. Ginther was nonetheless sympathetic to Nilsa's attachment CT Page 2297 to her children. All three children know their mother and have had regular, monthly visitation with her through the years. She found that while the children wanted their mother's love and attention, they did not feel particularly safe with her. The DCF social workers have testified to a relationship between Nilsa and her daughters which is more that of a playmate and friend than a parent. Dr. Ginther also testified that if there were to be reunification between the girls and Nilsa and then Nilsa again relapsed, the children would be devastated and a relapse would be hurtful to them.
Curiously, despite her findings, Dr. Ginther did not recommend a termination of Nilsa's rights to her children. She felt that Nilsa should be given more time to deal with her addiction, that the girls should have therapy with their mother to work on the relationship between them and only after a year of sobriety on Nilsa's part would she recommend re-evaluation of the situation to determine whether or not they should be returned to her at that time. As she expressed it, "the children have already experienced the loss of one biological parent. If you weigh what is the risk that they feel abandoned against the risk of giving them the opportunity to develop a better bond with their mother, the risk of abandonment is worse than the other." Strangely, she does not consider her own finding that the foster parents are the psychological parents of these children, and not their biological mother. Nowhere in her balancing formula has she given any weight to this very important significant connection. She also overlooks the sad truth that the children have already been abandoned by their mother for a considerable number of years.
The court finds these both peculiar and ominous omissions, for Dr. Ginther's focus is on the entitlement of a biological parent to her children and not what is at present in the best interests of these children, supported by her own findings. As highlighted by DCF, the report, provided by Dr. Ginther with the exception of her conclusion, contains facts and findings in support of termination, not supporting further delay and re-evaluation after the passage of even more time. Tricia, Martika and Stephanie have been in foster care placement since August of 1993. This is a very long time for children who were then ages eight, three and one year and eight months old respectively. These children's sense of time and their desperate need for permanency is nowhere given credence by Dr. Ginther in the balancing of the factors she had considered. CT Page 2298
"A child's sense of time is based on the urgency of his or her instinctual and emotional needs and thus differs from an adult's sense of time, as adults are better able to anticipate the future and thus to manage delay." JOSEPH GOLDSTEIN, ET AL.,BEYOND THE BEST INTERESTS OF THE CHILD 98, (1979) Also, "the significance of parental absences depends, then, upon their duration, frequency, and the developmental period during which they occur. The younger the child, the shorter is the interval before a leave-taking will be experienced as a permanent loss accompanied by feelings of helplessness and profound deprivation. Since a child's sense of time is directly related to his capacity to cope with breaches in continuity, it becomes a factor in determining if, when and with what urgency the law should act."Ibid., p. 42. Nilsa's recovery from her addiction has consumed a significant period of time in her children's lives, and there is no certainty about the stability of her recovery. In the meantime, for these children, the law has taken an extraordinary length of time to provide them with only the chimera of permanency and they are exhibiting the effects of this uncertainty.
4. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112(e):
1) Appropriate and timely services were offered by the Department of Children and Families, including drug abuse treatment, both in-patient and out-patient, counseling, visitation and transportation assistance. Until March of 1997, Nilsa did not take part in any services on any consistent basis. No services were offered to Roberto A. as he has never come forward to express any interest in his daughters.
2) The court finds by clear and convincing evidence that the Department of Children and Families made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. No efforts were made as to Roberto A. as to do so would be futile. Nilsa has had the benefit of almost four years of extraordinary services by the time of the filing of the termination petitions. From the point of view of the needs of her children, the efforts made continued too long.
3) The Department entered into reasonable and realistic court expectations in order to reunify the family. None were set for CT Page 2299 Roberto A. as he never sought to participate. Those set for Nilsa were reasonable and realistic, but she remained unable to comply with them.
4) All three children exhibit strong emotional ties with their foster families, who have provided the physical, emotional and educational support the children need. While the children interact with their mother, they are all concerned about being returned to her, given their past experiences and wish to remain in the care of their foster parents. Neither Martika nor Stephanie has any connection to Roberto A., as he has never been involved with them.
5) Finding regarding the ages of the children. Tricia is twelve years and eight months old. Martika is eight and Stephanie is six years old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (a) the extent to which the parents have maintained contact with the children as part of an effort to reunite the children with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. Robert A. has done nothing to adjust his circumstances to make it in the best interests of the children to be returned to him. Nilsa A. has done much in the last eleven months and had made laudable and tremendous strides towards her rehabilitation. But it is "too little and too late", as stated by DCF; far too late for these children, whose needs for permanency are acute.
7) Finding regarding the prevention of the parents from having a meaningful relationship etc. DCF has taken many steps to encourage Nilsa A. to have a meaningful relationship with her daughters and to rehabilitate herself, which she has been unable to accomplish within a reasonable time. As to Robert A., DCF has taken all reasonable steps.
5. DISPOSITION
Tricia, Martika and Stephanie have spent a substantial portion of their childhoods in foster care. They are in need of permanency and their psychological parents are their foster CT Page 2300 parents, all of whom are willing to adopt them. Their biological mother has made a start on her recovery from drug addiction, but that recovery is only eleven months old. She is not yet in an independent living setting, where the stresses of every day life will affect and test her resolve to remain drug-free. Giving her more time to rehabilitate and leaving these children's placement still undecided is not in the children's best interests. Each of the children has flourished in foster care. Their therapists all recommend their permanent placement. The court concludes, based on the clear and convincing evidence, that termination is in their best interests. Accordingly, a termination of the parental rights of Nilsa A. to all three children and of Roberto A. to Martika and Stephanie is ordered. It is further ordered that the Commissioner of the Department of Children and Families be appointed the statutory parent for the three girls for the purpose of securing adoptive families and permanent placements for them. If their present foster parents remain willing to adopt the children, it is the court's direction that they be given first consideration. The Commissioner shall file with this court no later than ninety days following the date of judgment a written report of efforts to effect such permanent placements and file further reports as are required by state and federal law.
Barbara M. Quinn, Judge Child Protection Session