MEMORANDUM OF DECISION
CT Page 10425
By motion dated July 31, 2000, the maternal grandmother, P. J., moved the court for articulation of the bases for its Ruling on Petition for Termination of Parental Rights, dated July 25, 2000 ("Ruling"), in which the court granted a petition for termination of parental rights filed by the Department of Children and Families ("DCF" or "petitioner") concerning Karari J. The court has granted her motion by separate order. This Memorandum sets forth the factual and legal basis for the court's Ruling.[2]
As noted in the Ruling, on August 20, 1999, DCF filed a petition to terminate the parental rights of S. J., mother, and R. W., father, to their child, Karari J. By Motion to Amend, dated April 28, 2000, DCF submitted an amended petition (the "petition"). The court granted the motion to amend and the adjudicatory date, by agreement, became April 28, 2000.[3] By order dated May 25, 2000, the court permitted Karari's maternal grandmother, P. J., to intervene as a party for dispositional purposes only.[4]
Trial concerning the petition, as amended, was held on July 18 and 19, 2000. On July 18, 2000, S. J.'s written consent to the termination of her parental rights was accepted by the court. Previously, on March 7, 2000, R. W.'s consent to the termination of his parental rights was accepted by the court. In view of the parents having consented to the termination of their rights, the subject of the trial was limited to the question of the disposition of the petition only. Three witnesses testified, including P. J., who was represented by counsel at trial. Evidence was presented in documentary form as well, and, pursuant to motion, the court took judicial notice of other facts. In view of the parents' consents, the court was and is not required to make the findings set forth in Conn. Gen. Stat. § 17a-112 (d).
FACTS
The court finds the following facts and credits the following evidence, except as noted.
A. Background of the Case
Karari was born on October 11, 1989. On October 1, 1996, the Superior Court for Juvenile Matters (Downey, J.) issued an order of temporary custody ("OTC") concerning him, finding that he was suffering from serious physical injury and that he was in immediate physical danger from his surroundings. A neglect petition was filed, which alleged that Karari CT Page 10426 was being denied proper care and attention. The evidence submitted to the court reflected that, in February, 1996, a teacher reported that Karari had come to school with an eye injury, which he attributed to a beating from his mother, S. J. At a September 27, 1996 home visit, a DCF social worker found Karari to once again have an injured eye. He was then living with his mother and siblings. Both mother and child attributed this injury to Karari having "walked into a wall." At the time of the visit, Karari was shaking and crying and appeared fearful of S. J.
On the same day, Karari disclosed to DCF that his uncle had struck him with a belt. Examination on the same day at the Yale New Haven Children's Hospital Emergency Room disclosed a fresh laceration in the corner of Karari's right eye. On the right side of his back was a red abrasion. There were more than ten linear lesions on his back. There were multiple lesions on all four of his extremities. The physical findings evidenced recent as well as older injuries. The locations of some of these injuries were suggestive of non-accidental injury. Karari was placed in DCF's temporary care and the OTC ensued.
On March 3, 1997, after a nolo contendere plea by S. J., Karari was found to be neglected and his care and custody were committed to DCF for up to twelve months. His commitment to DCF has been extended since that time and he has remained in foster care since October, 1996. In March, 1998, and September, 1998, the court found that further efforts to reunify Karari and his mother were not appropriate.
In the petition, DCF alleged several grounds for the termination of parental rights. DCF alleged abandonment, failure to rehabilitate, and no ongoing relationship as to R. W. As to S. J., the allegations included failure to rehabilitate, acts of commission or omission, and no ongoing relationship. As noted, in view of their consents, the court need not make the specific findings required in cases where parents contest termination. Nevertheless, certain facts concerning his parents' conduct are discussed below since they relate to the disposition of the petition.
B. The Mother
S. J. was born in 1969. She is the mother of five children. Her history includes convictions for possession of narcotics with intent to sell, sale of hallucinogens/narcotics assault, and violation of probation. As of July, 1999, she was on probation as a result of a domestic violence incident involving an ex-boyfriend.
She left school at age 17, due to pregnancy, when she was in the tenth grade. She has a history of asthma and other physical ailments. CT Page 10427
She acknowledged twice stabbing the father of her two youngest children. Subsequent to Karari's removal, two 1998 domestic violence incidents involving S. J. and the same individual resulted in police intervention. Nonetheless, she engaged in no domestic violence counseling thereafter.
Her history of visitation to Karari and participation in recommended services were minimal. For example, in August, 1997, after Karari had been psychiatrically hospitalized earlier that year, DCF and Connecting Children and Families ("CCF") made arrangements for S. J. to attend parent training sessions at CCF and set up a visitation schedule. From August, 1997 to January 11, 1998, she attended one visit with Karari and only one training session.
S. J. consistently refused to acknowledge that Karari had been physically, sexually, and emotionally abused while he was in her home. In September, 1998, when he was almost nine years old, Karari disclosed to his therapist at CCF that, one and one-half to two years earlier, while he was living with his mother, he was sexually abused by his uncle, S. J.'s brother. He reported that his uncle forced him to touch his uncle's penis and put his uncle's penis in Karari's mouth. The uncle also put Karari's penis in the uncle's mouth. In addition, his uncle put his penis in Karari's buttocks.
Karari reported that this sexual abuse occurred "a lot." He disclosed also that his uncle made him hit his sisters with a belt. He also reported that his uncle had had intercourse with his sister (who was born in July, 1987) and put his penis in her mouth.
Using anatomically detailed dolls, Karari demonstrated what his uncle had done to his sister and to him. He stated that if he did not comply with his uncle's wishes, he would be beaten with a belt. He also indicated that his mother knew of this abuse, as "[s]he could hear me screaming."
Visits were suspended after these disclosures, and resumed in January, 1999. When advised of Karari's disclosures, S. J. stated that Karari was lying and that the reported abuse did not occur.
In July, 1999, Karari disclosed to his CCF therapist that his mother had sexually abused him as well. Karari's description of the abuse to which he was subjected by S. J. is described below, at 14.
In response to this disclosure, S. J. again said that Karari was lying. After it. visitation between Karari and S. J. was ended, except CT Page 10428 for a final visit which occurred prior to trial. Since July, 1999, S. J. did not call DCF to inquire about Karari's well-being, education or counseling.
C. The Father
R. W. did not make himself available in any way to be a parent to Karari. Since Karari's birth he has not been involved in Karari's life. As noted, on March 7, 2000, he consented to the termination of his parental rights.
D. Karari and his Progress in Foster Care
Karari is a child with special needs. He is the third oldest of S. J.'s children. He has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), Oppositional Defiant Disorder, Impulsive Control Disorder and Depressive Disorder. He was placed on Ritalin for his ADHD condition.
Following his placement in foster care, he was referred to counseling. He was psychiatrically evaluated at Elmcrest Hospital in December, 1996. Between December, 1996 and February. 1997 he attended the Elmcrest partial hospitalization program, Solutions for Children. Although S. J. was offered family therapy at Elmcrest, she did not attend any of the sessions. Karari was psychiatrically hospitalized at Yale New Haven Hospital from February 26, 1997 to March 13, 1997.
Bonita Robinson, a DCF social worker, was assigned to Karari's case from May, 1997 until September or October, 1999. When she met him, some six or eight months before she received the case, he was an angry, hostile child. His oppositional and defiant behavior included hitting, cursing, and stealing. During the first year after his removal, he was placed in several foster homes. In one, he was there less than two weeks since he engaged in hitting other children and sexually acting out behavior.
Finally, he was placed in his current home, a professional foster home. Professional foster homes involve foster parents who have extensive experience in child psychology and child care. They undertake rigorous ongoing training. One parent must be available seven days a week, twenty-four hours a day and cannot have a job outside the home. Karari has resided with the B. family since August, 1997 and has thrived in their care.
Since arriving at the B. home, he has been assisted also by a network of professionals, primarily under the auspices of CCF. He receives CT Page 10429 therapy from a social worker and has psychiatric visits. Karari has developed significant attachments to Mr. and Mrs. B., whom he refers to as "Mom" and "Dad." He is also bonded to the B.s' toddler son. The B. family has expressed their interest in adopting Karari. He considers himself to be part of the B. family.
CCF prepared periodic reports concerning Karari's progress with the B. family. Exh. 8. As of June, 1998, he was behaving well at school, was a choir member, and was active in sports. The B.s provided Karari with structure and supervision. They utilized teaching strategies with tight boundaries, as well as affection and praise. He had made academic progress as well, going from not being able to identify alphabetical letters to reading. At that juncture, which pre-dated his disclosures of sexual abuse in his mother's home, he was seen to be "very closed regarding his past, almost presenting as if he has no past." Id. (report of June 17, 1998, at 2).
As of April, 1999, CCF's report noted that Karari was very attached to the B.s' new baby, who was born the previous November. Id. (report of April 29, 1999, at 1). Karari still sometimes engaged in bizarre and inappropriate behavior, including urinating in his bedroom, hoarding food, and stealing. Stealing, in particular, remained a continuing problem. Id. at 2.
The July, 1999 disclosures concerning his mother were emotionally difficult for him. He was described by his therapist as "emotionally fragile and needs a good sense of stability, consistence, and structure to get him through this difficult time." Id. (letter dated July 23, 1999).
The October, 1999 report reflected that, while Karari continued to achieve academically, he was behind grade level. His therapist stated, "It is fairly clear that he will always struggle academically due to his early childhood deprivation." Id. (report of October 4, 1999, at 1). His stealing had decreased and he was "beginning to see himself as a good person and be proud of himself." Id. at 2.
At around the same time. Ms. Robinson's involvement with the case ended. To her, Karari had become a different child in the B.s' care. Due to their work (and his own efforts), he felt he was someone, that he was worth something. His foster parents had opened doors for him. During the approximately two-and-one-half years she had the case, neither S. J. nor P. J. contacted her concerning Karari's progress.
Most recently, his six months review from CCF, dated June 1, 2000, reflected the progress he has continued to make in the B.s' care. His CT Page 10430 therapist noted, "[t]he stability of this home has provided Karari with the environment he needed to assist him in gaining success in all areas of his life." Exh. 8. Nonetheless, on some days, he still exhibited out of control behavior, rages, and poor decision-making. At school, he became more resistive to doing homework and became more disorganized. Id. at 2. While he had made substantial gains, "because of his history of traumas he will need special support in place for a very long time." Id.
Karari has expressed his desire to be adopted by the B.s. He is closely attached to both of them, as well as to their now toddler son. Recently, when he was being evaluated by a psychologist, he was aware that his mother was in the same building at the same time and did not ask to see her. If he is adopted by the B.s, he would still want to visit with his mother.
E. The Grandmother
P. J. is the mother of S. J. and is Karari's grandmother. She works as a nurse's aide and is attending classes to become a licensed child caretaker. At trial, she claimed to have raised seven of her. own children and to have cared for many others.
She went to court with S. J. at various points. She claimed to have visited Karari two times since he was removed from S. J.'s care. She stated that she did not visit more because the times when visits were scheduled conflicted with her work schedule. This weak excuse for not visiting more frequently over a three-and-a-half year period is evidence of her lack of commitment to Karari.
P. J. stated that she saw him two or three times per week when Karari lived with his mother. Her statements concerning prior contact with him lacked credibility. When Dr. Bruce Freedman, a court-appointed evaluator, observed her interaction with Karari in September, 1999, Karari was almost ten years old. As noted below, at 14, Karari did not recognize her at the interactional visit. If she had seen him regularly until he was removed just before his seventh birthday, and visited him subsequent to his removal, at the least he would have recognized her.
Although she attended court hearings and was transported to court by DCF social worker Michael Taylor, who had been assigned to the case in November, 1999, she did not ask him for visits with Karari and did not ask questions concerning Karari's emotional status or educational progress. After Mr. Taylor became the assigned social worker, she sent Karari no gifts or cards, and did not call to ask about him. While she attended DCF's most recent administrative case review concerning plans for Karari, she did not ask anything about him.[5]
CT Page 10431
Karari has not asked to see his grandmother. He has not discussed his grandmother with Mr. Taylor or Ms. Robinson of DCF. P. J. is not mentioned in CCF's reports either. Exh. 8.
P. J. denied to Dr. Freedman that Karari had been abused in S. J.'s home, either by her daughter or by her son. At trial, she stated that she could take care of his special needs, that she wanted to do so, and that DCF should have considered her as a resource. She offered no explanation for the extensive lesions found on Karari's back and extremities when he was removed in October. 1996. When asked why Karari had special needs, she said she did not know and that he was not "like that" when he left home. To the court, that statement baselessly implied that he was mistreated in foster care. Clearly, P. J. was either still trying to protect her daughter at Karari's expense or had adopted a studied unwillingness to understand her grandson and the extensive abuse to which he was subjected while he was in her daughter's care.
F. Psychological Evaluations
In September, 1999, a court-appointed evaluator, Bruce Freedman, Ph.D., who is a clinical psychologist, conducted evaluations of B. B. and L. B., the foster parents; P. J.; and Karari. He also observed interactions of the B.s with Karari and P. J. with Karari. His report became Exhibit No. 7.[6]
B. B. reported that he and Karari were particularly close. After seeing his mother for an interactional visit observed by Dr. Freedman, Karari told B. B. that he did not want to ever live with his mother again "because he was afraid he would get beaten by her again." Exh. 7, at 5. B. B. told Dr. Freedman that, about eighteen months earlier, Karari had occasionally exhibited sexually inappropriate behavior with another foster child in their home, resulting in deprivation of privileges for Karari. Id. at 6. Dr. Freedman concluded that B. B. "showed signs of being an excellent, caring father, and a strong, positive role model for Karari." Id. at 7.
The foster mother, L. B., has had substantial professional experience in caring for troubled children. When Karari first arrived at her home, he was very angry, and took his clothes off and engaged in sexualized behavior. Initially, he caused a good deal of physical damage to the walls and other parts of their home. Id. at 7. She also described his extensive problem with stealing, at home, at school, and in stores, and his sexualized behavior with his foster brother. Nevertheless, she saw Karari as a terrific child who has brought his foster parents much happiness. Id. at 7-8. CT Page 10432
She reported a recent threat made at a court appearance by S. J. to "get" Karari's foster mother. Id. at 9. In addition to the previously described sexual abuse, Karari disclosed that his uncle and forced Karari to have sex with his sister and that his uncle forced Karari to watch while the uncle molested his niece. Id. at 9.
Dr. Freedman concluded that L. B. had an established career in the helping professions, a good working marriage, and a happy, well-adjusted family life. He termed her qualifications as a custodial parent as being "excellent." Id. at 9.
In her interview with him, P. J. advised Dr. Freedman that Karari's father, R. W., was a drug dealer. "She insisted that her son . . . had never molested Karari, echoing her daughter's claims that it must have happened in a foster home, that Karari was too young to remember such things, and that [S. J.] would never have allowed such things to happen." Id. at 10. She said that she did not believe Karari's reports of physical abuse either. Id.[7]
Dr. Freedman also noted,
 Mrs. J. said she had never had any contact with Karari during the past two years. She blamed this on the visits being scheduled in the morning, when she was at work. She said she had never acknowledged his birthday, Christmas, had never sent him cards, letters or anything else.
Id. at 10.[8]
P. J.'s presentation demonstrated
 two problems which would directly and adversely impact on her caretaking ability. The first problem was her complete lack of ability to recognize the physical and sexual abuse Karari had been exposed to, both by her daughter and her son. This denial would prevent her from being considered a safe caretaker, would prevent her from being inclined or trustworthy to limit the access of perpetrators of abuse, and would greatly increase the chances of her trying to gain custody in order to informally return Karari to his mother's care.
The second problem was her complete lack of interest CT Page 10433 and/or contact with Karari during the past three years of placement. Aside from a simple but flimsy excuse about inconvement visiting times, she had never made any effective attempt to monitor Karari's care in the past, protect him from abuse, or to visit, send cards, letters, gifts, or other acknowledgments to the child over the past three years. As a result, she was a total stranger to Karari. While she was not directly responsible for his care, her lack of interest on his behalf over the past three years made it difficult to take seriously her offer at the present time.
id. at 11.
Karari also was evaluated by Dr. Freedman. Karari said he "loved it" in his foster home. Id. He wants to be adopted by his foster parents.
Karari elaborated on the physical abuse he received at his mother's hands. She beat him with an electrical cord or belt, once cutting his scalp so that blood ran down his head. When he would wet his bed "once in a while" she would always beat him. Id. at 12. To him, before he left his mother's home "it seemed as if he was getting a beating every day." Id. He also witnessed other domestic violence in his home.
His mother was aware that his uncle had sexually abused him. He told Dr. Freedman that on one occasion his mother came downstairs while his uncle was molesting him. She saw both of them naked when his uncle was touching his penis. Id. at 12-13.
With regard to sexual abuse by his mother, Karari described an incident, after she gave him beating, when he was sitting on the floor and she touched his penis, pulled on it, and told him she was trying to make it hard. His mother took off her clothes and told him to touch her breasts. The same type of activities were repeated a couple of other times. Id. at 13.
Dr. Freedman found that Karari showed signs of a positive self-image. Id. He strongly regarded his foster family as his family. He has made a good adjustment to counseling and developed some stability in his foster home. Id. at 13-14. "He continued to show the after-effects of abuse and neglect, including sexual behavior, aggression toward other children, and compulsive stealing." Id. at 14.
With regard to the interactions. Dr. Freedman noted, during his observation of the B.s with Karari, that they discussed the plan for the observation, later that day, of Karari with his grandmother. He did not CT Page 10434 remember her. Id. at 15.
During the observed interactions with the B.s, his foster mother described the long list of chores which Karari faithfully did at their home. Id. Karari showed strong relationships with both foster parents. The foster parents showed "excellent interaction" with him. "Karari showed very little sign of past abuse, and this seemed strongly connected to the high level of nurturance, guidance, and encouragement he had received in this home." Id.
When the interaction with his grandmother occurred, "Karari came into the room, showing no recognition of his grandmother. He told her he forgot her name, so that she had to identify herself and explain her relation to him." Id. at 15. P. J. behaved appropriately at this visit. "He showed no signs of regaining recognition or closeness with his grandmother, although he accepted her presence in a limited way based on her biological relationship with him." Id. at 16.
Dr. Freedman concluded that P. J. had shown a "complete lack of contact or demonstrated interest in the child, as well as a denial of abuse of the child in any way by her daughter. This created a situation in which grandmother would not be reliable in terms of protecting the child, restricting access by mother or maternal relatives, or handling or accepting his special needs and problems." Id. at 16.
In response to specific referral questions, Dr. Freedman summarized his views. "The records and Karari's memories suggested strongly that he had been the family scapegoat, whose behavior problems and abusive handling escalated together until he was finally removed from his mother's care." Id. Clearly, Dr. Freedman found Karari's consistent descriptions of the past abuse to be credible.
With regard to the nature of Karari's present relationship with his mother. Karari viewed her as "physically abusive, sexually inappropriate, and failing to protect him. . . ." Id. at 17. While he never wanted to return to her home, "he was able to maintain a visiting relationship with her. He did not look to her for affection, security, guidance, or someone who could bring him into adulthood." Id.
In contrast, the B.s are Karari's psychological parents. Id. at 18. He continues to show specialized needs and will need "careful parenting and professional help to steer him toward a healthy, productive life." Id. at 19. Dr. Freedman concluded that further efforts toward reunification of Karari with his mother would not be appropriate. Id. His relationship with her has steadily diminished in importance to him. Id. at 20. Her visits to him were sparse and of poor quality. Id. Her refusal to CT Page 10435 acknowledge her own mistakes was also significant. Id. at 20-21.
With regard to whether additional time in foster care would be in Karari's best interest, Dr. Freedman stated, "Karari was secure and comfortable in his foster home. However, protecting and solidifying this home through adoption would be strongly in the child's best interests." Id. at 20.
ADJUDICATION
In the disposition phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112
(c)(2); In re Juvenile Appeal (83-CD), 189 Conn. 276, 285 (1983). The court can consider all events occurring through the close of the disposition hearing. Practice Book § 33-5.
Because of the deleterious effects of prolonged temporary placement, "time is of the essence" for Karari. In re Anthony B., 54 Conn. App. 463,476 (1999); In re Alexander V., 223 Conn. 557, 565 (1992). The Appellate Court has "consistently held that to allow a child to languish in foster care is not in the child's best interest." In re Drew R.,47 Conn. App. 124, 131 (1997). Our Supreme Court has noted that "long-term stability is critical to a child's future health and development." (citation omitted) In re Eden F., 250 Conn. 674, 709, motion for en banc reargument denied, 251 Conn. 924 (1999).
As a preliminary matter, the court will address the evidence and argument offered by P. J., the intervenor. In her closing, she argued that she had always sought to care for Karari and that she was not considered by DCF as a resource. This argument was echoed by S. J. as well.
Where a child "should reside and with whom, however, are not questions that relate to whether it is in his best interests to terminate his relationship with his parents." In re Denzel A., 53 Conn. App. 827, 834
(1999). A relative's intervention is authorized not to effect an adoption or to obtain custody but for the purpose of affecting the termination itself Id. at 835. As noted in Denzel A., in a case where termination was warranted, delay in termination would result in delay in finding permanent home for the child, whether that home should be with a relative or with some other person or persons. Id. More recently, the Appellate Court added that, "[t]he presence of a compelling interest in terminating the respondent's parental rights is not diluted merely because a relative demands custody." In re Shane P., 58 Conn. App. 244, 262 (2000) ("Shane P."). CT Page 10436
It must also be stated that P. J.'s presentation was unpersuasive. For good reasons, she could not and cannot be a caretaking resource for Karari. In her closing, P. J. attempted to distinguish Shane P., by claiming that placing Karari with her would not involve moving him into the kind of unhealthy atmosphere which was described in Shane P. The discussion in Shane P. is instructive. There, as in Karari's case, the state had a compelling interest in assuring the child's physical and psychological well-being. Id., 58 Conn. App. 260. Like Karari, Shane was a child "with special heeds who requires extraordinary care from a dedicated, loving parent." Id.
The Appellate Court noted that transferring Shane's guardianship to his grandparents would have meant separating him from his foster mother and father, who were "dedicated to meeting his special needs, with whom Shane has bonded and whom he calls mommy and daddy." Id. The same Would be true for Karari.
The court also observed that under the proposed transferral, Shane would be cared for by "biological grandparents to whom he refers as no more than [his biological brother's] grandparents, who did not recognize Shane's past birthdays and do not currently-inquire into his well-being at his foster home." Id. Again, the same would be true for Karari. P. J. is a stranger to Karari. She did not maintain contact with him or inquire about his well-being in foster care. In contrast, in Shane's case, he had visited with his grandparents twice a month. In The Interest of ShaneP., 1998 Ct. Sup. 1210, 1222 (February 2, 1999) (Schuman, J.), affirmed,58 Conn. App. 244 (2000).
The Appellate Court further noted that, if his guardianship was transferred, Shane would no longer live with foster siblings he cared about and got along with in his foster home; instead, he would live with two biological brothers whom he hardly knew and who were receiving counseling or behavioral difficulties. In re Shane P., supra58 Conn. App. 261. Here, under P. J.'s plan, Karari would also be removed from the B.s' toddler, to whom he has grown close, and would live with his grandmother, whom he hardly knows.
The Appellate Court considered significant also that if his grandparents were to receive Shane's guardianship, they planned to return him to his mother after her release from prison and that she had shown "questionable responsibility toward him." Id.[9]
In Karari's case, the risks for him are, if anything, greater than they were for Shane. In cases of this type, "psychological testimony from professionals is rightly accorded great weight." (citation omitted). In reCT Page 10437Eden F., supra, 250 Conn. 707. Here, Dr. Freedman convincingly offered the assessment that P. J. should not be considered as a caretaker for Karari. First, she had demonstrated no commitment to him over time. Second, since she denied that he had been abused, and failed to appreciate his special needs, he would not be safe in her care. Instead, he would be at risk once again. She would not be able to protect him from being subjected again to the type of physical. sexual, and emotional abuse he suffered in his mother's home. In addition, the court's assessment, based on her testimony, is that P. J.'s presentation lacked credibility. It is evident that she has not candidly addressed Karari and his situation. As the Appellate Court stated, "[f]orcing a child back into a potentially unhealthy and far less supportive atmosphere merely for the sake of having the child live in the same dwelling as relatives" is not required. Id., 58 Conn. App. 262.
Permanency is critical for Karari, especially in view of his special needs. Dr. Freedman's statement that continued foster care is not in his best interest is credited by the court.
Also, the record is clear that Karari's foster parents are his psychological parents. The concept of the "psychological parent" repeatedly has been discussed by Connecticut courts in cases of this type. Soon after its publication in 1979, the Supreme Court cited Goldstein, Freud Solnit's Beyond The Best Interests of The Child("Beyond") and the authors' "suggestion that child placement should maintain `on a continuous, unconditional, and permanent basis a relationship with at least one adult who is or will become the child's psychological parent.'" Seymour v. Seymour, 180 Conn. 705, 711 (1980).
Beyond, at 98, defined a "psychological parent" as "one who, on a continuing, day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills the child's psychological needs, as well as the child's physical needs," quoted in Temple v. Meyer,208 Conn. 404, 408, n. 3 (1988); see also, In re Tricia A.,1998 Ct. Sup. 2290,2296 (February 27, 1998) (Quinn, J.), affirmed, 55 Conn. App. 111
(1999); In re Four Children, 1997 Ct. Sup. 10217, 10225 (October 10, 1997) (Foley, J.). In In re Romance M., 229 Conn. 345, 356 (1994), the Supreme Court recognized the important distinction between a psychological parent and a "person who visits."
Karari's substantial progress in foster care must be credited in large part to the efforts of his foster parents, as well as to CCF and to Karari himself. He presented and presents difficult parenting challenges. The B.s have committed themselves to Karari, as he has committed himself to them. CT Page 10438
The evidence is clear and convincing that termination is in his best interest. His biological parents have consented to the termination of their rights. His grandmother, P. J., does not know him fails to recognize his needs as an individual. There is no doubt that placement with her would leave open the risk that he would once again become the family's scapegoat and sexual plaything. Those responsible for his well-being cannot allow him to be subjected to such a risk.
His mother has not maintained a consistent interest in Karari and did little to engage in services to help herself improve as a parent. There is no reason to deny Karari permanency merely to allow the current situation to continue. After all, there is no reason to believe that she can ever play a parental role in his life.[10] Whether or not she will be allowed to visit Karari (and whether or not P. J. will be allowed to do so) should be up to those caring for Karari and to his therapist.
Fortunately, Karari has been in the same loving and supportive home since August, 1997. He is bonded to his foster parents; to him they are his "mom" and his "dad." They wish to adopt him and he wishes to be adopted by them.
To deny termination would leave Karari in prolonged foster care for no reason. As a result, he could be subjected to further legal proceedings concerning his guardianship when he is older, of which he could once again become aware, and which could be disruptive to his development. Since Karari is entitled to permanency and since time is of the essence, termination is in his best interest.
CONCLUSION
1. Based on clear and convincing evidence, as reflected in the foregoing discussion, the court determines that it is in the best interest of Karari J. for termination of parental rights to enter with respect to the mother, S. J., and the father, R. W.
2. Accordingly, the court grants the petition to terminate the parental rights of S. J. and R. W.
3. The court further orders that the Commissioner of DCF is appointed statutory parent to Karari. In view of their stated willingness to adopt Karari, the court directs that his foster parents. Mr. and Mrs. B., be given first consideration.
4. The court declines to issue an order concerning providing information to Karari about S.W.'s willingness to visit Karari. The court assumes that her counsel will communicate further on this subject to CT Page 10439 DCF. Whether or not such information will be conveyed to Karari will be up to those caring for Karari.
5. The Commissioner shall file with this court, no later than sixty days following the date of judgment, a written report of efforts to effect permanent placement and file the further reports as are required by state and federal law.
6. In view of her consent to the termination of her rights and in view of the previous Ruling and this Memorandum of Decision, S. J.'s Motion to Revoke Commitment, dated May 20, 1999, and her Motion for Custody, dated March 6, 2000, are denied.
It is so ordered.
BY THE COURT
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT